**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

CONAN DOYLE ESTATE LTD.


       Plaintiff,

v.                                    No.1:15-CV-432

MIRAMAX, LLC,
ROADSIDE ATTRACTIONS LLC,
PENGUIN RANDOM HOUSE LLC,
MITCH CULLIN, WILLIAM CONDON,

       Defendants.

**COMPLAINT FOR INJUNCTION AND DAMAGES**

    Plaintiff Conan Doyle Estate Ltd. (CDEL) alleges as follows for its Complaint against Defendants Penguin Random House, Roadside Attractions, LLC, Miramax, LLC, Mitch Cullin, and William Condon.

**INTRODUCTION**

    1.    This action for copyright infringement arises from unauthorized copying by Mitch Cullin—in his novel *A Slight Trick of the Mind* and in the motion picture *Mr. Holmes* based on the novel—of original Sherlock Holmes stories written by Sir Arthur Conan Doyle (Conan Doyle). The remaining defendants have participated in copying these protected stories in the infringing movie, have published and distributed the infringing novel and motion picture, and have titled the movie so as to confuse consumers and unfairly trade on CDEL's goodwill.

    2.    Defendant Mitch Cullin grew up in Santa Fe, New Mexico, and through his father became acquainted with the noted Sherlockian scholar and collector John Bennett Shaw, who also lived in Santa Fe. Defendant Cullin had access to all of Conan

1

Doyle's works in Mr. Shaw's library. Cullin's dedication of *A Slight Trick of the Mind* included a dedication to "the late John Bennett Shaw, who once left me in charge of his library." It is apparent from *A Slight Trick of the Mind*—a story of Sherlock Holmes in retirement—that Mr. Cullin read deeply in Conan Doyle's Sherlock Holmes stories, including those protected by copyright.

3.      The first fifty of Conan Doyle's Sherlock Holmes short stories and novels are in the public domain. But the last ten of his original Sherlock Holmes stories, published between 1923 and 1927 (the Ten Stories), remain protected by copyright in the United States. These copyrighted ten stories develop the details of Holmes's fictional retirement and change and develop the character of Holmes himself.

4.      Two of Conan Doyle's public domain stories make references to Holmes's retirement, placing the following elements about it in the public domain: in "The Adventure of the Second Stain," Conan Doyle writes that Holmes "has definitely retired from London and betaken himself to study and bee-farming on the Sussex Downs," and "notoriety has become hateful to him." In "His Last Bow," Conan Doyle writes that in retirement Holmes was "living the life of a hermit among your bees and your books in a small farm upon the South Downs." These are the only public domain references to Holmes's retirement.

5.      But Conan Doyle wrote much more about Sherlock Holmes's retirement and later years—including an entire short story set in the Sussex Downs in which the retired Holmes solves one last case. This story, "The Adventure of the Lion's Mane," significantly develops the fictional world of Holmes's later life. In this story Conan Doyle created original details such as the lonely farmhouse in which Holmes lives on a

ridge overlooking the English Channel, with chalk cliffs visible in the distance and a path down to the sea.

6. Along with other copyrighted stories, "Lion's Mane" also adds important traits to Holmes' character. For example, in his later years, living in the countryside instead of London, Holmes comes to love nature and dedicates himself to studying it. Other copyrighted stories give Holmes in his later years a personal warmth and the capacity to express love for the first time.

7. Cullin took these and many other protected elements of setting, plot, and character in *A Slight Trick of the Mind.* Cullin has Holmes living in a lonely farmhouse on a ridge over the Channel. Chalk cliffs are visible in the distance and a path leads down to the sea. Holmes's love of nature and developing ability to express love are central to Cullin's story.

8. Cullin also copied entire passages from Conan Doyle's copyrighted story "The Adventure of the Blanched Soldier." Cullin took from that story the creative point of view of Holmes rather than Watson narrating a detective story—and the plot behind it: that Watson has remarried and moved out of Baker Street.

9. Cullin then closely mimics the next passage from "Blanched Soldier," about Holmes's view of the liberties Watson took in writing Holmes's exploits, complete with an imaginary conversation between the two on the subject.

10. Cullin copied the next passage from "Blanched Solider" as well. Conan Doyle wrote:

> It is my habit to sit with my back to the window and to place my visitors in the opposite chair, where the light falls full upon them. Mr. James M. Dodd seemed somewhat at a

> loss how to begin the interview. I did not attempt to help
> him, for his silence gave me more time for observation. I
> have found it wise to impress clients with a sense of power,
> and so I gave him some of my conclusions.
> "From South Africa, sir, I perceive."
> "Yes, sir," he answered, with some surprise.

Cullin copies not only the seating placement using the window's light to advantage, but the full sequence of the client's resulting awkwardness, Holmes allowing the discomfort and using it for observation, then impressing his client with conclusions and noting the client's surprised reaction. Cullin writes:

> As was my usual custom, I sat with my back to the window
> and invited my visitor into the opposite armchair, where—
> from his vantage point—I became obscured by the
> brightness of the outside light, and he—from mine—was
> illuminated with perfect clarity. Initially, Mr. Keller
> appeared uncomfortable in my presence, and he seemed at
> a loss for words. I made no effort to ease his discomfort,
> but used his awkward silence instead as an opportunity to
> observe him more closely. I believe that it is always to my
> advantage to give clients a sense of their own vulnerability,
> and so, having reached my conclusions regarding his visit, I
> was quick to instill such a feeling in him.
> "There is a great deal of concern, I see, about your wife."
> "That is correct, sir," he replied, visibly taken aback.

11.     Cullin took telling details that confirm he copied from protected stories. For example, Cullin copied the detail of Watson securing new lodgings in Queen Anne Street—a fictional detail Conan Doyle invented only in the copyrighted 1924 story "The Adventure of the Illustrious Client."

12.     Cullin also took from copyrighted stories that Holmes has gotten over his distaste for dogs and has come to love them. Conan Doyle creates this development in a copyrighted story and has Holmes plan to write a monograph on "*the uses of dogs in the work of the detective*." (emphasis added.) Cullin takes Holmes's love for dogs from this

story and has him write a monograph titled *The Use of Dogs in the Work of the Detective*.

13.     Cullin took far more significant protected creativity as well. For example, Conan Doyle in "Lion's Mane" has developed Holmes so that he reacts with warmth and emotion to the woman at the center of the story—unlike his famous indifference to women in public domain stories. Cullin copies this character development, not only by placing a woman at the center of the detective story Holmes narrates, but having Holmes react to her with genuine emotion.

14.     Defendant Penguin Random House published this infringing novel with full knowledge of the ten copyrighted stories of Conan Doyle.

15.     Defendant Cullin then served as a screenwriter adapting his novel to create the motion picture *Mr. Holmes*, starring Sir Ian KcKellen and Laura Linney. The picture's theatrical release in the United States is set for July 17, 2015. Reviews of its early screenings, together with trailers released in the United States, reveal that the motion picture uses the same elements from Conan Doyle's copyrighted stories.

## PARTIES AND JURISDICTION

16.     Plaintiff Conan Doyle Estate Ltd is a United Kingdom corporation formed by the family of Sir Arthur Conan Doyle to license and manage the rights in and associated with Conan Doyle and his work. The Conan Doyle Estate works with authors and motion picture studios to bring out new Sherlock Holmes stories, from Anthony Horowitz's novels *House of Silk* and *Moriarty* to Paramount Pictures' *Young Sherlock Holmes*, Warner Brothers' ongoing *Sherlock Holmes* movies, the BBC's television series *Sherlock* (shown in the United States on PBS), and CBS's *Elementary*. Conan

Doyle's licensing representative is Hazelbaker & Lellenberg, Inc., whose principal place of business is in Santa Fe, New Mexico.

17.     Defendant Mitch Cullin lived in Santa Fe, New Mexico part of his life and is now a resident of California. He is the author of *A Slight Trick of the Mind* and was a screenwriter for the motion picture *Mr. Holmes*. Cullin contracted to have his book distributed in all fifty states including New Mexico, and on information and belief many copies of the book have been sold in New Mexico since its publication in 2005. Defendant Cullin has also contracted to have the infringing motion picture *Mr. Holmes* distributed in all fifty states including New Mexico, beginning on or about July 17, 2015.

18.     Upon information and belief, Defendant Penguin Random House LLC is a Delaware limited liability company with a principal place of business in New York. Penguin Random House regularly conducts business in all fifty states, including New Mexico, and over the past ten years has distributed and sold many copies of the infringing novel *A Slight Trick of the Mind* in New Mexico.

19.     Defendant William Condon is a resident of California and has directed several motion pictures released nationwide, including in New Mexico. He directed *Mr. Holmes*, copying emotions, character traits, and other protected elements from Conan Doyle's copyrighted Ten Stories.

20.     Upon information and belief, Defendant Miramax LLC is a Delaware limited liability company which regularly distributes motion pictures and otherwise conducts business in all fifty states, including New Mexico, has contracted to distribute

6

the infringing motion picture *Mr. Holmes* in the United States, and has taken steps to release it in New Mexico on or about July 17, 2015.

21.     Upon information and belief, Defendant Roadside Attractions LLC is a California limited liability company which regularly distributes motion pictures and conducts business in all fifty states, including New Mexico. Along with Miramax, Roadside has contracted to distribute the infringing motion picture *Mr. Holmes* in the United States, and has taken steps to release it in New Mexico on or about July 17, 2015.

22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because all the defendants are subject to personal jurisdiction in this district.

## FACTS

23.     Conan Doyle Estate Ltd. is the assignee of the copyrights owned by Dame Jean Conan Doyle, the last surviving child of Sir Arthur Conan Doyle. After passage of the 1976 Copyright Act, Dame Jean exercised her rights under 17 U.S.C. § 304 to recover the copyrights in her late father's works. Copies of each Notice of Termination were duly recorded in the United States Copyright Office.

### The Estate's Copyrights

24.     Although some copyrights have expired with the passage of time, the copyrights in the following ten stories, published in the United States between 1923 and 1927, remain in force:

"The Adventure of the Creeping Man" (1923)
"The Adventure of the Sussex Vampire" (1924)
"The Adventure of the Three Garridebs" (1924)
"The Adventure of the Illustrious Client" (1924)
"The Adventure of the Three Gables" (1926)

"The Adventure of the Blanched Soldier" (1926)
"The Adventure of the Lion's Mane" (1926)
"The Adventure of the Retired Colourman" (1926)
"The Adventure of the Veiled Lodger" (1927)
"The Adventure of Shoscombe Old Place" (1927)

25.     These Ten Stories create many details of setting, plot, and background in

the fictional world of Sherlock Holmes. They also add protected features to the Holmes

and Watson characters that make for the fully-formed characters depicted in the

infringing novel and motion picture. As some of the twentieth century's most inventive

and compelling fiction, these elements are highly original and protectable. They include

the following:

> • Many details of Holmes's retirement, from fictional
> details of the setting noted above to Holmes's markedly
> different interest in the natural world and his becoming
> caught up in solving one last case—with a woman at its
> center to whom Holmes reacts differently than he has to
> most other women in his life.
>
> • Holmes develops a gentler demeanor, emotional
> warmth, and the ability to show love in his later years.
>
> • Holmes's and Watson's relationship changed over the
> years, developing from that of mere companions into a
> truly close friendship.
>
> • Holmes's knowledge of medicine and his use of it for
> detection is created in copyrighted stories and was
> unknown about him from public domain stories.
>
> • Holmes embraces modern technologies and uses them in
> his practice for the first time in copyrighted stories,
> revealing his attitude toward science and technology. In
> the copyrighted "Shoscombe Old Place" (1927), Holmes
> pioneers the use of the microscope as an investigative
> tool, and in "The Lion's Mane" employs photographic
> analysis for detection.
>
> • Holmes changes from caring little for dogs to having
> such great interest in them and their relationship to

humans that, in the copyrighted "The Creeping Man"
(1923), he intends to write a monograph on the subject.

**The Estate's Trademarks**

26.     The Estate has extensively used and licensed SHERLOCK HOLMES as a trademark and service mark. The Estate developed rights in its SHERLOCK HOLMES mark long before the activities of defendants in preparing the motion picture *Mr. Holmes*, and the SHERLOCK HOLMES mark serves as a powerful indicator of goods and services sponsored by or otherwise affiliated with the Estate.

27.     The Estate owns United States trademark registrations for SHERLOCK HOLMES®, including Reg. No. 4,690,745 for cultural, educational, and entertainment exhibitions. The Estate also owns pending registration applications for SHERLOCK HOLMES, Serial Nos. 77/937,863, 77/937,845, 77/937,813, and 77/937,852. These applications, filed February 17, 2010, cover the following goods and services:

> • Entertainment services, namely, production of motion pictures, television dramas, stage plays, and radio programs; entertainment services, namely, providing online electronic games, online computer games, and online video games;
>
> • Motion picture and television films featuring musical, dramatic, comedic and theatrical performance; prerecorded goods, namely, prerecorded audio and video cassettes, compact discs, and digital versatile discs all featuring audio books and stories in the field of detective fiction, motion picture and television films, animated cartoons, radio programs, music, and games; downloadable electronic publications in the nature of e-zines and electronic books in the field of detective fiction;
>
> • Printed matter, namely, books, short stories, magazines, and newsletters in the field of detective fiction; photographs; story books; and
>
> • Games and playthings, namely playing cards, board games, puzzles, and action figures.

28.     The Estate has developed common law trademark protection for SHERLOCK HOLMES for the above goods and services—including motion picture and television series—by virtue of its consistent licensing of its mark. Every major motion picture and television production in the past thirty years using SHERLOCK HOLMES has been released in the United States in association with the Estate, from Lorindy Pictures' 1981 television movie series *Sherlock Holmes*, Paramount Pictures' 1985 movie *Young Sherlock Holmes*, and Granada's 1989 television series *Sherlock Holmes*, to Warner Brothers' current *Sherlock Holmes* movies and the BBC's *Sherlock*. Because of its widespread use in connection with Estate-licensed motion pictures and television series, SHERLOCK HOLMES has tremendous power as a source identifier of the Estate.

### Cullin's Novel Borrows Substantially from Copyrighted Stories

29.     In addition to Defendant Cullin's access to the copyrighted Sherlock Holmes stories described above, all of the defendants have had constant access and exposure to the Ten Stories, which have been widely published and portrayed in popular movies and television series for the past eighty years. For example, the British television series *The Case-Book of Sherlock Holmes*, depicting the Ten Stories (under license from CDEL's predecessor in interest Dame Jean Conan Doyle), was broadcast in the United States between 1991 and 1993 on PBS. Countless television programs and movies have depicted Sherlock Holmes as changed and developed in the Ten Stories.

30.     As noted above, Conan Doyle dramatically developed Sherlock Holmes's retirement in the copyrighted 1926 story "The Adventure of the Lion's Mane." In it Conan Doyle changed Sherlock Holmes. Holmes now loves the quiet of

nature. He writes of his "withdrawal to my little Sussex home, when I had given myself

up entirely to that soothing life of Nature . . . ." Conan Doyle has his mature Holmes

become attentive to nature in a new way ("all Nature was newly washed and fresh," he

says), and he devotes his time to observing and studying nature.

31.     This original development in Holmes's character is infringed on every

page of Cullin's book. Cullin has Holmes write: "I no longer crave the bustle of London

streets, nor do I miss navigating through the tangled mires created by the criminally

disposed. Moreover, my life here in Sussex has gone beyond pure contentment, and the

majority of my waking hours are spent either in the peaceful solitude of my study or

amongst the methodical creatures who inhabit my apiary." Copying Conan Doyle in

"Lion's Mane," Cullin expresses Holmes's love of nature, in part by meditative walks

along the path to the beach and along the seashore.

32.     Cullin has Holmes articulate his belief in nature when he writes to his

housekeeper's young son:

> Not through the dogmas of archaic doctrines will you gain
> your greatest understandings, but, rather, through the
> continued evolution of science, and through your keen
> observations of the natural environment beyond your
> windows. To comprehend yourself truly, which is also to
> comprehend the world truly, you needn't look any further
> than at what abounds with life around you—the
> blossoming meadow, the untrodden woodlands. Without
> this as mankind's overriding objective, I don't foresee an
> age of actual enlightenment ever arriving.

33.     Cullin copied the setting of his novel from Conan Doyle's "Lion's

Mane." Conan Doyle writes, "My villa is situated upon the southern slope of the

Downs, commanding a great view of the Channel," with chalk cliffs visible in the

distance and a path leading down to the sea. He continues, "My house is lonely. I, my old housekeeper, and my bees have the estate all to ourselves." At the beginning of the story Holmes goes out for a morning walk on the path leading to the beach.

34.     Both *A Slight Trick of the Mind* and *Mr. Holmes* copy the lonely villa, the chalk cliffs in the distance, the path to the beach, and Holmes's walks on it.

35.     Conan Doyle also changed Holmes in later life by giving him a gentleness and kindness Holmes did not possess in public domain stories. The copyrighted mature Holmes is quite unlike the more clinical and purely rational Holmes described in public domain stories. Conan Doyle expresses this change through Holmes's dialogue and the tone of his narration. Cullin infringes this copyrighted character development on every page of his book.

### The Story Within the Story

36.     *A Slight Trick of the Mind* tells not only a story of Holmes in retirement but also has Holmes writing a story of his own: his last case as a detective. This story within the story, which Cullin titles "The Glass Armonicist," is unusual for a Sherlock Holmes story in that it is not narrated by John Watson, but by Holmes himself in the first person—as is "Lion's Mane."

37.     Only one other story by Conan Doyle is narrated by Holmes in the first person, and it is the copyrighted 1926 story "The Adventure of the Blanched Soldier." In that story Conan Doyle invents the reason for Holmes's narration: Holmes explains that he is living alone in his Baker Street lodgings because John Watson has moved out to get remarried. Although in a public domain story Watson moved out the first time he

got married, Conan Doyle's decision to have him remarry and leave Holmes a second

time is a creative choice made only in this copyrighted story.

38.     Cullin's "Glass Armonicist" copies this entire plot element of remarriage

and its accompanying first-person creative point of view: Cullin has Holmes narrate the

story himself, explaining that he is living alone in Baker Street because John Watson

has remarried and moved out.

39.     After taking this from "Blanched Soldier," Cullin goes on to quote the

next passage from "The Blanched Soldier" as well. Conan Doyle wrote:

> Perhaps I have invited this persecution, since I have often
> had occasion to point out to him [Watson] how superficial
> are his own accounts and to accuse him of pandering to
> popular taste instead of confining himself rigidly to facts
> and figures. "Try it yourself, Holmes!" he has retorted,
> and I am compelled to admit that, having taken my pen in
> my hand, I do begin to realize that the matter must be
> presented in such a way as may interest the reader.

Cullin copies:

> During the years in which John was inclined to write
> about our many experiences together, I regarded his
> skillful, if somewhat limited, depictions as exceedingly
> overwrought. At times, I decried his pandering to popular
> tastes and asked that he be more mindful of facts and
> figures . . . . In turn, my old friend and biographer urged
> me to write an account of my own. "If you imagine I have
> done an injustice to our cases," I recall him saying on at
> least one occasion, "I suggest you try it yourself,
> Sherlock!"
> . . . The results . . . [showed] me that even a truthful
> account must be presented in a manner which should
> entertain the reader.

40.     Cullin goes right on copying from "Blanched Soldier," using the next

passage from that story as the next passage in his "Glass Armonicist," as noted earlier.

Conan Doyle wrote:

> It is my habit to sit with my back to the window and to
> place my visitors in the opposite chair, where the light
> falls full upon them. Mr. James M. Dodd seemed
> somewhat at a loss how to begin the interview. I did not
> attempt to help him, for his silence gave me more time for
> observation. I have found it wise to impress clients with a
> sense of power, and so I gave him some of my
> conclusions.
>> "From South Africa, sir, I perceive."
>> "Yes, sir," he answered, with some surprise.

Cullin copies:

> As was my usual custom, I sat with my back to the
> window and invited my visitor into the opposite armchair,
> where—from his vantage point—I became obscured by
> the brightness of the outside light, and he—from mine—
> was illuminated with perfect clarity. Initially, Mr. Keller
> appeared uncomfortable in my presence, and he seemed at
> a loss for words. I made no effort to ease his discomfort,
> but use his awkward silence instead as an opportunity to
> observe him more closely. I believe that it is always to my
> advantage to give clients a sense of their own
> vulnerability, and so, having reached my conclusions
> regarding his visit, I was quick to instill such a feeling in
> him.
>   "There is a great deal of concern, I see, about your
> wife."
>   "That is correct, sir," he replied, visibly taken aback.

41.     Cullin has Watson taking new lodgings in Queen Anne Street, copied

from Conan Doyle's protected 1924 story "The Adventure of the Illustrious Client." A

more subtle but important copying is the solicitousness and respect Holmes shows for

Watson at the beginning of "A Glass Armonicist." This particular respect for Watson is

taken in part from the protected stories "The Three Garridebs" and "The Adventure of the Lion's Mane."

42. In Conan Doyle's copyrighted "Lion's Mane," a beautiful woman is attached to the man at the center of the case. Holmes reacts differently to this woman than he has to other women in his past. In public domain stories Holmes "never spoke of the softer passions, save with a gibe and a sneer." ("A Scandal in Bohemia.") In "Lion's Mane" Holmes is much different:

> But the words were taken from my mouth by the appearance of the lady herself. There was no gainsaying that she would have graced any assembly in the world. Who could have imagined that so rare a flower would grow from such a root and in such an atmosphere? Women have seldom been an attraction to me, for my brain has always governed my heart, but I could not look upon her perfect clear-cut face, with all the soft freshness of the Downlands in her delicate colouring, without realizing that no young man would cross her path unscathed.

Cullin similarly has Holmes react from his heart rather than just his mind to the woman at the center of "The Glass Armonicist."

43. One of the most striking of Conan Doyle's copyrighted developments in Holmes's character is that in his later life Holmes warms emotionally and develops the ability to express love. Holmes might easily have remained a rationalist in his later years, suppressing his emotions to the end. But Conan Doyle made the opposite artistic decision in copyrighted stories. Conan Doyle expresses this character development in several of the Ten Stories, including "The Three Garridebs" and "Lion's Mane." For example, Conan Doyle writes in "Three Garridebs," after the story's villain fires a gun and Watson is hit:

> "You're not hurt, Watson? For God's sake, say that you are not hurt!"
>
> It was worth a wound—it was worth many wounds—to know the depth of loyalty and love which lay behind that cold mask. The clear, hard eyes were dimmed for a moment, and the firm lips were shaking. For the one and only time I caught a glimpse of a great heart as well as a great brain. All my years of humble but single-minded service culminated in that moment of revelation.

44.     This new ability and readiness of Holmes to feel and express emotion is a central change in his character. Cullin uses it on nearly every page of his infringing novel and in many scenes of his movie. Cullin has Holmes feel many emotions in his novel—and near its end Holmes speaks of love to his housekeeper, after her son has died. Copying Conan Doyle, Cullin writes that she has never heard him utter the word before.

45.     Cullin took from the copyrighted "The Adventure of the Creeping Man" Holmes's collection of scientific books on nature subjects. In the same story by Conan Doyle, Holmes has developed a love for dogs, in marked contrast to Holmes's attitude toward dogs in public domain stories—where, in "A Study in Scarlet," Holmes poisons a dog in cold blood as a forensic experiment. By contrast, in the copyrighted "Creeping Man" Holmes talks about writing a monograph on "*the uses of dogs in the work of the detective*." (emphasis added.) Cullin takes Holmes's love for dogs from this story and has him write a monograph titled *The Use of Dogs in the Work of the Detective*.

**The Motion Picture Was Co-Written by Defendant Cullin and Makes Substantial Infringing Use of the Same Copyrighted Elements; In Addition it Trades On CDEL's Goodwill With the Title *Mr. Holmes***

46.     The producers of *Mr. Holmes* have consistently represented the motion picture as based on Cullin's *A Slight Trick of the Mind*. Not only is the movie adapted

16

from the book, but Defendant Cullin himself was one of the movie's screenwriters. Although *Mr. Holmes* has not yet been released in the United States, its producers have released several trailers. The trailers make it clear that the movie closely follows the book.

47.     The trailers show that Defendant William Condon's and Sir Ian McKellen's portrayal of Holmes make full use of the emotions and growing warmth Conan Doyle created for Holmes in the copyrighted Ten Stories.

48.     The trailers also confirm that the movie makes extensive infringing use of a host of other creative elements Conan Doyle developed in copyrighted stories— including Holmes's love for nature, his reacting from his heart to the beautiful woman in his last case, Holmes's own developing capacity to express love, his new love for dogs, Watson's getting re-married and leaving Holmes' Baker Street lodgings, and Holmes's relationship with Watson becoming a genuine friendship.

49.     The movie even reproduces Holmes's secluded house, complete with chalk cliffs in the distance and a path leading down to the sea.

50.     The movie uses a title confusingly similar to CDEL's trademark SHERLOCK HOLMES, creating a likelihood that consumers will mistakenly believe CDEL has sponsored or is affiliated with defendants' motion picture, and thereby unfairly trading on CDEL's goodwill.

**The Publisher, Writer, and Motion Picture
Producers All Refuse to Acknowledge Copying from
Protected Stories or the Misuse of CDEL's Trademark**

51.     Defendant Cullin wrote his novel *A Slight Trick of the Mind* in 2005. The Conan Doyle Estate refrained from pursuing the infringement until a motion picture

began to be produced. At that point CDEL wrote to the author, the book publisher, and movie producers describing the copying from Sir Arthur's copyrighted works.

52.     Defendant Penguin Random House refused to acknowledge the copying—and where copying was obvious, claimed fair use—even though the United States Court of Appeals for the Seventh Circuit has held within the last year that elements such as Watson's leaving Baker Street to remarry and Holmes's love of dogs are protected by the copyrights in the Ten Stories.

53.     The producers of the motion picture said they would seek a license from the Conan Doyle Estate but never did so. The Conan Doyle Estate wrote to Penguin Random House, Mr. Cullin, and the movie producers to state that it respected the added originality in Cullin's story and the quality of both the book and movie, and wanted to reach a rational resolution acknowledging the contributions of Conan Doyle and Cullin.

54.     Penguin Random House, the motion picture producers and distributors, and Mr. Cullin ignored the letter.

55.     Defendants Miramax and Roadside Attractions have scheduled the United States release of *Mr. Holmes* for July 17, 2015.

## COUNT I

## COPYRIGHT INFRINGEMENT
## IN *A SLIGHT TRICK OF THE MIND*

### (*against Defendants Cullin and Penguin Random House LLC*)

56.     CDEL incorporates by reference all of the foregoing allegations.

57.     CDEL owns registered copyrights in the Ten Stories.

58.     The Ten Stories contain highly original creative expression protected by copyright.

59.     Defendants had access to the Ten Stories, which have been widely published since 1927 and aspects of which have been portrayed in popular movies and television for decades. The Ten Stories were personally accessible to Defendant Cullin in the library of John Bennett Shaw.

60.     Defendants copied protected expression from the Ten Stories.

61.     Upon information and belief, all copies of the Ten Stories to which defendants had access contained copyright notices. Because of these copyright notices, among other reasons, defendants knew or should have known the Ten Stories were protected by copyright laws.

62.     Defendants were never authorized to copy protected elements from the Ten Stories.

63.     Upon information and belief, defendants willfully infringed the copyrights in the Ten Stories by reproducing highly original fictional expression from these copyrighted works in *A Slight Trick of the Mind*, creating unauthorized derivative works using that protected expression, and distributing such unauthorized works.

64.     Defendants' actions violate CDEL's exclusive rights under 17 U.S.C. § 106, and constitute willful infringement of CDEL's copyrights in the Ten Stories. Defendants' past and continuing copying and distribution of *A Slight Trick of the Mind* constitutes willful, deliberate, and ongoing infringement of CDEL's copyrights, causing actual and continuing damage to CDEL.

**COUNT II**

**COPYRIGHT INFRINGEMENT IN *MR. HOLMES***

(*against Defendants Cullin, Condon, Miramax, LLC, and Roadside Attractions LLC*)

65.     CDEL incorporates by reference all of the foregoing allegations.

66.     CDEL owns registered copyrights in the Ten Stories.

67.     The Ten Stories contain highly original creative expression protected by copyright.

68.     Defendants had access to the Ten Stories, which have been widely published since 1927 and portrayed in popular movies and television for decades. The Ten Stories were personally accessible to Defendant Cullin in the library of John Bennett Shaw. *Mr. Holmes* is substantially similar to protected expression from the Ten Stories.

69.     Defendants copied substantial protected expression from the Ten Stories.

70.     Upon information and belief, all copies of the Ten Stories to which defendants had access contained copyright notices. Because of these notices, among other reasons, defendants knew or should have known the Ten Stories were protected by copyright laws.

71.     Defendants were never authorized to copy protected elements from the Ten Stories.

72.     Upon information and belief, defendants willfully infringed the copyrights in the Ten Stories by reproducing original expression from the copyrighted works in *Mr. Holmes*, creating unauthorized derivative works using that protected expression, and distributing, displaying, and performing such unauthorized works.

73.     Defendants Cullin, Condon, Miramax, and Roadside Attractions are presently threatening to further distribute, display, and perform the infringing *Mr. Holmes*, together with infringing images and portions thereof, in a theatrical release of *Mr. Holmes* nationwide beginning July 17, 2015.

74.     Defendants' actions violate CDEL's exclusive rights under 17 U.S.C. § 106, and constitute willful infringement of CDEL's copyrights in the Ten Stories. Defendants' past and continuing copying and threatened future distribution of *Mr. Holmes* constitutes willful, deliberate, and ongoing infringement of CDEL's copyrights, and are causing irreparable harm to CDEL.

75.     CDEL has no adequate remedy at law.

## COUNT III

### TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION IN *MR. HOLMES*

(*against Defendants Cullin, Condon, Miramax, LLC, and Roadside Attractions LLC*

76.     CDEL incorporates by reference all of the foregoing allegations.

77.     Defendants' use of confusingly similar imitations of CDEL's marks in connection with the advertising, sale, offering for sale, distribution, and other exploitation of defendants' motion picture, and defendants' authorizing or contributing to the foregoing, without CDEL's permission and consent, has created and will continue to create confusion in the marketplace and a false impression in the minds of the public that CDEL is somehow sponsoring or affiliated with defendants, or that CDEL is associated with or endorsing defendants' movie.

78.     Defendants have used marks confusingly similar to CDEL's federally registered marks in violation of 15 U.S.C. § 1114, and have made false representations, false descriptions, and false designations of origin in violation of 15 U.S.C. § 1125(a).

79.     Defendants' activities have caused, and unless enjoined by this Court will continue to cause, a likelihood of confusion and mistake among members of the public and, additionally, injury to CDEL's goodwill and reputation as symbolized by its common law and federally registered marks, for which CDEL has no adequate remedy at law.

80.     Defendants' actions demonstrate an intentional, willful, and malicious intent to trade on CDEL's marks and reputation, to cause confusion, mistake, and deception, and to take advantage of the goodwill and public recognition associated with CDEL's marks for their own commercial advantage, to CDEL's irreparable injury.

81.     Defendants have caused and are likely to continue causing substantial injury to CDEL and to the public, and CDEL is entitled to injunctive relief and to recover actual damages, defendants' profits, enhanced profits and damages, costs, and reasonable attorneys' fees under 15 U.S.C. §§ 1114, 1116, and 1117.

## JURY DEMAND

CDEL hereby demands a jury trial.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs demand:

A.     That defendants, their directors, officers, agents, subsidiaries, and affiliates and all persons acting by, through, or in concert with any of them, be permanently enjoined from the following:

1)  using and infringing the copyrights of Plaintiffs in any manner, and from reproducing, exhibiting, transmitting, displaying, distributing or preparing derivative works from any copyrighted material in the Ten Stories;

2)  using or infringing CDEL's trademarks, or using any other trademark confusingly similar to CDEL's trademarks in connection with the marketing or display of defendants' motion picture or other merchandise;

3)  using any false designation of origin or false description which can or is likely to lead the public, or individual members thereof, erroneously to believe either that any motion picture or merchandise or service was prepared, offered for sale, licensed, sponsored, endorsed, or authorized by CDEL, when such is not the case; and

4)  assisting, aiding, or abetting any other person or entity in engaging in or performing any of the activities referred to in subparagraphs (1)–(3) above;

B.     That defendants be required to pay to CDEL such actual damages as it has sustained as a result of defendants' copyright infringement pursuant to 17 U.S.C. § 504;

C.     That defendants be required to account for and disgorge to CDEL all gains, profits, and advantages derived from their copyright infringement pursuant to 17 U.S.C. § 504(b);

D.      That defendants be required to pay CDEL statutory damages and an increase in the award of statutory damages due to defendants' willful infringement pursuant to 17 U.S.C. § 504(c);

E.      That defendants be required to pay CDEL all such damages, profits, enhanced profits and damages, costs and reasonable attorneys' fees as are warranted under 15 U.S.C. §§ 1114, 1116, and 1117.

F.      That the Court enter judgment for CDEL and against defendants for all claims, including pre- and post-judgment interest, as allowed by law;

G.      That the Court enter judgment against defendants finding that their unlawful copying of the Ten Stories was and is willful;

H.      That defendants be ordered to pay CDEL its costs in this action along with reasonable attorneys' fees; and

I.      That CDEL be granted such other relief as is just and equitable.

Respectfully submitted,

SUTIN THAYER & BROWNE
A Professional Corporation


By */s/ Benjamin Allison*
         Paul Bardacke
         Benjamin Allison
317 Paseo de Peralta
PO Box 2187
Santa Fe, NM  87501
Tel: (505) 988-5521
Fax: (505) 982-5279
ballison@sutinfirm.com
7110187.doc

*Counsel for Plaintiff*
*Conan Doyle Estate Ltd.*

24